In re Appeal of Williamson.

(No. 19779—Decided March 21, 1969.)

Common Pleas Court of Paulding County.

Mr. *Patrick H. Young,* for appellant.
Mr. *Russell J. McMaster,* prosecuting attorney, for respondent.

HITCHCOCK, J. An Ohio State Highway patrolman arrested appellant about 7:55 o'clock p. m., March 6, 1968, on a charge of driving while under the influence of alcohol. Section 4511.19, Revised Code. The patrolman showed and read to appellant the explanation required by the "Implied Consent Statute" (Section 4511.191, Revised Code). In response to the concluding question, "Will you now give me a specimen of (blood—urine—breath) for analysis to determine your concentration of alcohol?" the patrolman wrote the appellant's answer was, "No."

The patrolman then made his affidavit before the Deputy Clerk of the Paulding County Court that he had reasonable grounds to believe that Joseph Williamson was, while under the influence of alcohol, driving a motor vehicle upon the public highways of Ohio, that he was arrested for that reason, and that he refused to give a chemical test specimen upon request, even though advised of the consequences of his refusal as indicated in the written form prescribed.

Appellant was then removed to the Paulding County Jail from whence friends took him home for the night and the morning of March 7, 1968, a standard complaint affidavit was filed in the Paulding County Court, No. 1271, Docket No. 18, Page 424, formally charging him with the offense for which he was arrested and requiring him to appear before the court at 1:00 o'clock P. M., March 8, 1968.

Later in the day of March 7, 1968, counsel for appellant obtained an order from the Paulding County Court continuing the cause "until March 13, 1968, at 11:00 o'clock A. M., and said defendant is hereby released on his own recognizance for appearance at said time."

Appellant and counsel appeared on March 13, 1968, and to the charge entered a plea of "Guilty." The court

informally continued the cause to March 15, 1968, for sentencing, at which time appellant received the identical sentence which the present Paulding County Court has always imposed upon first DWI offenders, viz: to pay a fine of $100.00, be imprisoned in the county jail for three days, to pay the costs, and to have his driver's license suspended for the period of thirty days.

Appellant immediately served his imprisonment, paid the fine and costs, and surrendered his driver's license to the court for mailing to the Bureau of Motor Vehicles together with the court's report of disposition of the offense charged. It not appearing just when such report was made, the court will presume that there was compliance with the penultimate paragraph of Section 4507.16, Revised Code, reading:

"After an operator's or chauffeur's license has been suspended or revoked, the trial court shall cause the offender to deliver to the court such license, and the court or clerk of such court shall, if such license has been suspended, or revoked in connection with any of the hereinbefore mentioned crimes, forthwith forward to the registrar such license together with notice of the action of the court."

On or about March 21, 1968, appellant received, via certified mail, a letter from the Bureau of Motor Vehicles dated March 20, 1968, addressed to Joseph Williamson, Route No. 1, Haviland, Ohio, designated File No. 30-68-92867 informing appellant that the bureau had received the patrolman's affidavit concerning the events of March 6, 1968, relating to his refusal to submit to chemical test when arrested for DWI. This letter also notified appellant that by reason of Section 4511.191(D), Revised Code, his driver license or privilege was suspended for a period of six months effective March 6, 1968, recited his right to appeal within twenty days in the words of the statute, and stated that if an appeal petition was filed, "the effective date of the suspension indicated above is automatically cancelled and the suspension will begin upon termination of any hearing and/or appeal which results in a decision

unfavorable to you. The law further requires that you furnish this office a notification of and a copy of any such petition that is filed.''

On April 5, 1968, appellant filed in the Paulding County Court, in Case No. 595 his ''petition to revoke order of suspension by bureau of motor vehicles of driver's license'' and on the same day sent a copy of said petition together with a notice of appeal to the registrar of motor vehicles. By letter dated April 10, 1968, addressed to the clerk of this court the bureau acknowledged receipt of a copy of said filed petition. A copy of this letter was also sent to the prosecuting attorney who is charged with representing the state of Ohio in these appeals.

On April 9, 1968, the Judge of the Paulding County Court informed the presiding judge of this court that he felt he should disqualify himself from hearing this appeal, whereupon said presiding judge designated the Common Pleas Court of Paulding County to hear and determine this matter pursuant to Section 2937.20, Revised Code.

Thereupon the County Court certified the entire file to this court where it was given No. 19779.

Despite the words in both the suspension order of the bureau dated March 20, 1968, and in Section 4511.191(E), Revised Code, reading:

''If a person whose license or permit to drive has been suspended petitions for a hearing or appeals any decision which is adverse to him, the suspension shall begin at the termination of any hearing or appeal unless the hearing or appeal resulted in a decision favorable to the person,''
the Bureau of Motor Vehicles, after the appeal was perfected, did not restore appellant's driver's license to him. The attorney who perfected the appeal then withdrew as appellant's counsel and present counsel on June 17, 1968, filed a motion asking the court to issue a show cause order against the bureau why his license should not be returned to him until this appeal be determined. An order thereupon issued directing the bureau to return appellant's license forthwith or show cause on a day certain why not.

Appellant's driver's license was then promptly restored to him.

The court requested counsel to file briefs herein and on July 30, 1968, appellant's counsel did so but the prosecuting attorney failed to do so. The matter was assigned for hearing and on November 7, 1968, there appeared the appellant with his counsel and the prosecuting attorney and the matter was heard and argued.

In addition appellant established certain facts which the state did not deny. Although the court finds it unnecessary to consider these facts in resolving what it deems the fundamental issue presented, it will in this paragraph recite them. Appellant was arrested in Paulding County. He asked for counsel. This request was denied. He was taken to Defiance County where is located a patrol station having the equipment necessary for making the statutory examination to scientifically determine percentages of alcohol in body fluids. Within one-half hour of his arrest it was explained to appellant that failure to submit to the chemical test would doubtless result in loss of his driver's license for a period of six months. Again appellant asked for counsel which was denied him. Declining to give the necessary consent to the examination appellant was returned to Paulding and left at the Paulding County jail from whence friends removed him to his home about midnight, March 6, 1968.

The state's basic position is that this court does not have jurisdiction to consider on this appeal anything except the items specifically delineated by statute, viz.: (Section 4511.191, Revised Code.)

"(F) * * * The scope of such hearing shall be limited to the issues of whether a police officer had reasonable ground to believe the person had been driving a motor vehicle upon the public highways in this state while under the influence of alcohol, whether the person was placed under arrest, and whether he refused to submit to the test upon request of the officer, and whether he was advised of the consequences of his refusal."

As the court views appellant's true position it is that

his situation puts none of these items in issue because by his plea of "guilty" to the offense charged in the criminal proceeding he admitted that the officer had reasonable ground to arrest him as he did. In this appeal he openly admits that he was advised by the officer of the consequences for refusing to take said chemical test and that he did so refuse. His argument is that in these circumstances administrative suspension of his driver's license for six months is unconstitutional, he having obviated by his conduct every purpose for which Section 4511.191, Revised Code, was enacted.

Consequently, the court finds that it has jurisdiction to consider what it conceives to be the basic issue which is, "Does that part of Article I, Section 16, Ohio Constitution, reading, 'All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. * * *' permit the Bureau of Motor Vehicles to suspend a driver's license for six months for refusing, while such driver's faculties are allegedly impaired, to submit to a chemical test for ascertaining the level of alcohol in body fluids, when, upon the first occasion thereafter when his faculties are not impaired and he has the benefit of sober reflection or the assistance of counsel, he pleads "guilty" to a properly laid charge of the offense for which he was arrested?" This court answers this question, "No," for reasons hereinafter set out.

There can be no real doubt that Section 4511.191, Revised Code, on its face and in itself is constitutional. *Schmerber* v. *California* (1956), 384 U. S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908. *Westerville* v. *Cunningham* (1969), 15 Ohio St. 2d 121. And if the driver had plead "not guilty" to the criminal charge, no successful challenge to the six months suspension could succeed, whatever the outcome of the criminal prosecution. *Marbut* v. *Motor Vehicle Dept. of Highway Comm.* (1965), 194 Kan. 620, 400 P. 2d 982; *State* v. *Muzzy* (1964), 124 Vt. 222, 202 A. 2d 267. Or

even where the refusal caused the police to reduce the charge to public intoxication. (A move the court would suspect was made to avoid any charge of false arrest against the officer.) *Bowers* v. *Hults* (Sup. Ct. 1964), 42 Misc. 2d 845, 249 N. Y. S. 2d 361. But it seems likely that an accused could demand that he be tried for the offense for which he was arrested, however improbable such a demand might be.

Even a plea of "no contest" as introduced into Ohio Jurisprudence and provided by Section 2937.06, Revised Code, effective January 1, 1960, in respect to misdemeanors would not avail appellant here. The reason is that the words "no contest" are the equivalent of the latin words *"nolo contendere"* as this plea was known in the common law. There it was recognized as an implied confession of guilt and was permitted only in certain misdemeanors not requiring punishment by imprisonment, it being discretionary with the court whether it should be accepted or rejected. If the plea was accepted by the court, it was taken as a tacit admission of guilt so far as *pertained to that case only*, but it was not admissible in a civil proceeding on the same facts to show that defendant had admitted the truth thereof. See Bouvier's Law Dictionary, (3 Rev.) 2352.

The Ohio Constitution bottoms all Ohio law not resting upon the supreme law of the land—the Constitution of the United States, treaties and valid Acts of Congress— whether denominated criminal, civil, administrative, or some other name. And the manner of the application of any statute in respect to its subject is, I perceive, particularly a subject of judicial inquiry which the Legislature may not lawfully forbid. Should I be found to be in error on this point, then surely Chapter 2721, Revised Code, providing for declaratory judgments in courts of record grants this court authority to declare the law in the circumstances of this case.

What is crucial is the impact of the law, not alone upon the citizen directly affected, but upon everyone inci-

dentally involved. The Supreme Court of Ohio has held that all valid legislation must bear a substantial relation to the purpose sought to be effectuated. *Froelich* v. *Cleveland* (1919), 99 Ohio St. 376; *Teegardin* v. *Foley* (1957), 166 Ohio St. 449.

As early as 1827 the Supreme Court of Ohio, in *Allen* v. *Parish*, 3 Ohio 187, said in opinion at page 198 that:

"* * * Courts of law are not warranted in giving such a construction to the acts of a legislature as must necessarily work injustice and be fraught with injurious consequences, unless that the intent of the Legislature that they shall be so understood, is manifest, and clear beyond any rational doubt. * * *"

even though it has not since always adhered to this position. In two cases decided in 1853 it was said:

(1) "It is a rule of interpretation, of universal application, that a law is to be so construed as to carry out the *intention* of the maker, and that to ascertain that *intention*, not merely is the language of the law, to be looked to, but also the subject-matter to which it relates, the evil provided against, and the attending circumstances and understanding, at the time the law was framed." *Toledo Bank* v. *Bond*, 1 Ohio St. 622 at 637.

(2) "In the interpretation of a statute, the manifest reason and intention of the law should prevail, although at variance with the literal import of the language employed." Syllabus, *Slater* v. *Cave*, 3 Ohio St. 80.

See also, in respect to federal statutes, *Holy Trinity Church* v. *United States* (1892), 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226.

This court has heretofore held that wrong action taken under provisions of valid statutes may not justify the termination of a pharmacist's license. *In re Pollak's Appeal* (1962), 89 Ohio Law Abs. 112.

Students of government have for centuries disagreed as to how the terms "legislative power" and "judicial power" are rightly defined, particularly along the line that divides them. In recent years I perceive a trend in pre-

vailing judicial opinion steadily eroding meaning from the words "legislative power." The consequences in terms of practical everyday affairs are probably yet to be finally determined. Surely I strive to accord legislative prerogative its due and to avoid undue partiality for judicial power and am ever mindful of Dean Landis's observation: "General contentment with the wide scope of judicial review exercised since the Fourteenth Amendment has robbed Legislatures of much of their opportunity to make out the aims of the law, and has generated in the profession something of contempt for the legislative process." James Landis, Statutes and the Sources of the Law, p. 218, 1934, Harvard Legal Essays, Harvard University Press, Cambridge, Mass. For myself, I deem it improper to disregard a statute simply because it reaches a legal conclusion different from my own, and especially when the precise issue has been clearly debated by the legislative body which has reached a definite conclusion in respect to such issue.

The court has carefully read the excellent article appearing in Case Western Reserve Law Review, Vol. 20, p. 277 (Nov. 1968) entitled, "Ohio's 'Drunk Driving' Statute," by Terence J. Clark. It seems worthy of note that not one of the many cases referred to and discussed in this study dealt with the situation where, upon gaining sobriety after arrest and refusal to take requested chemical tests, the driver in his criminal prosecution had with common promptitude, obviated every purpose the "implied consent" statute could possibly serve by his plea therein of "guilty."

The purpose, and no doubt it is a salutary one, of the "implied consent" law is to provide safer drivers on our highways by making available to law enforcement officers evidence so that truth may be established in court from which may ensue criminal penalties or civil liabilities.

Many, perhaps most, drinkers are dangerous drivers. A few, if my perception be correct, who have a precise knowledge of exactly how they are affected by alcohol, apparently are not. The purpose of the various chemical

tests of breath, saliva, blood, and urine is to determine the percentage of alcohol in the body at a given time—particularly at the time of arrest or within two hours thereof—by means which do not torture mental processes, or compel a mental reaction or a conscious speaking self-incrimination violative of the Fifth Amendment of the Constitution of the United States. These tests do provide evidence of the true physiological state of a person's body in respect to the percentage of alcohol in the body fluids tested at a particular time, providing, of course, that they have been correctly made with proper equipment.

Extensive and well publicized common experience, affirmed time and again by scientific examination and comparison, provide known standards of intoxication which have been clearly demonstrated to be unsafe and presumptively unlawful for drivers on our highways.

So it is clear that the whole purpose of the "implied consent" law is to: (1) provide evidence to establish truth in court, or (2) if the driver frustrates this purpose by refusal to take the prescribed tests to impose legal consequences administratively which will enable the state to deny such driver the use of the highways for six months in order to protect the public because of the manifest probability that he is a dangerous driver; assuming, of course, that the officer had reasonable cause to make the original arrest.

Now when, as here, the first advised plea of the accused is "guilty" and is made within ten days of his arrest and refusal to take the tests, it seems to me that he has obviated every legitimate purpose the "implied consent" statute can have.

He has admitted that his arrest was lawful and precluded any false arrest charge against the officer. He has placed himself in the power of the court to impose upon him far greater suspension of his driver's license than for a period of six months, and in addition, moderately severe criminal penalties. His plea of "guilty" may be introduced in any civil proceeding as an admission of his condi-

tion at or near the time of his arrest if necessary to fix civil responsibility as Section 1.16, Revised Code, states:

"Any one injured in person or property by a criminal act may recover full damages in a civil action, unless specifically excepted by law. No record of conviction, unless obtained by confession in open court, shall be used as evidence in a civil action brought for such purpose."

Although I have known for years that in Ohio this is true, I have never had time and occasion to investigate the reason for this rule. Why something proven beyond any reasonable doubt in one judicial inquiry denominated criminal must always, if the bad actor prove contumacious, be proven again by a mere preponderance of evidence in another judicial proceeding denominated civil, if the victim is to be compensated, has aroused my curiosity. I do hope that our legislators will soon re-examine this statute and make their report thereon available to the general public.

Now, of course, this court is aware of common propensities among litigants in court to avoidance of decision, delay of procedure, and even downright prevarication— to say nothing of the fact that the court has known individuals who kept themselves in a continuous state of intoxication for a number of weeks. The court recognizes that the statute must be administered and fairly so and believes that ten days should be adequate to provide more than 99% of all persons in the circumstances of appellant opportunity to regain sobriety after arrest and, if so desiring (whether or not after consultation with counsel) to enter a plea of "guilty" in a court of record to the charge for which he was arrested. The court understands that an official report of such plea of "guilty" would ordinarily reach the Bureau of Motor Vehicles within five days after such plea was made.

Consequently, I hold that in a case where (1) a police officer arrests a licensed driver on a charge of driving while under the influence of alcohol, (2) such driver is asked to take a chemical test to determine the percentage of alcohol in his body after full explanation of the conse-

quences of his refusal but nevertheless refuses to take the test, (3) such driver is then prosecuted for the offense for which he was arrested, (4) appears in court at his first arraignment with counsel and within ten days of his arrest, (5) enters a plea of "guilty" to the offense for which he was arrested, and (6) notice of such a plea of guilty reaches the Bureau of Motor Vehicles within 15 days of his arrest—such driver is not accorded justice by due course of law if the Bureau of Motor Vehicles nevertheless proceeds to suspend his driver's license for a period of six months, for the reason that in these circumstances the action suspending his license is irrational and serves no valid purpose.

This disposition of the narrow issue before the court will also prevent the needless imposition of injurious consequences upon those arrested drivers whose refusal to be tested is primarily based upon religious scruples or irrational fears of infection from the administration of some chemical tests.

For reasons which must be obvious to students of the law this cause has troubled the court much as Lord Nottingham, Chancellor, was troubled by *The Duke of Norfolk's Case* (1682), Chancery, 3 Ch. Cas. 1, 22 Eng. Rep. 931, wherein near three centuries ago was forged the fundamental concept of the rule against perpetuities.

For me his language (if perhaps a bit quaint in today's world) still powerfully and majestically expresses a peculiarly salutary judicial attitude. Consider these paragraphs from mentioned opinion:

"I take it then to be good both in law and equity; and if I could alter my opinion, I would not be ashamed to retract it; for I am as other men are, and have my partialities as other men have. When all this is done, I am at the bar desired to consider further of this case: I would do so, if I could justify it; but expedition is as much the right of the subject, as justice is, and I am bound by Magna Carta, *nulli negari, nulli differe justitiam.* I have taken as much pains and time as I could to be informed; I cannot help it if

wiser men than I be of another opinion; but every man must be saved by his own faith, and I must discharge my own conscience.

"I have made several decrees since I have had the honor to sit in this place, and yet I was not ashamed to make them, nor sorry when they were reversed by others. And I assure you, I shall not be sorry if this decree which I do make in this case be reversed too; yet I am obliged to pronounce it, by my oath and by my conscience. For I cannot adjourn a case for difficulty out of an English Court of equity into the parliament; there never was an adjournment *propter difficultatem*, but out of a court of law where the proceedings are in Latin. The proceedings here upon record are in English, and can no way now come into parliament, but by way of appeal to redress the error in the decree. I know I am very likely to err, for I pretend not to be infallible; but that is a thing I cannot help. Upon the whole matter, I am under a constraint, and under an obligation I cannot resist. A man behaves himself very ill in such a place as this, that he needs to make apologies for what he does; I will not do it, I must decree for the plaintiff in this case, and my decree is this. * * *"

Were I able to find any evidence that the Ohio Legislature, in adopting our present "implied consent" or "drunkdriver" statute had contemplated the circumstances of cases such as appellant's here and had nevertheless deliberately decided that all drivers arrested as was appellant must nevertheless thereafter suffer six-months license suspension, even though upon sober appraisal, they promptly obviate, in judicial record, every salutary purpose the statute could possibly have, because they conclude it necessary for the general safety of all, I would have no difficulty in honestly disagreeing with such conclusion. But in such event, I would have great difficulty in saying that the Legislature did not have the right and power to make such law for I cannot forget the words of our first Chief Justice John Jay in No. 3 of the Federalist papers:
"* * *

"Among the many objects to which a wise and free people find it necessary to direct their attention, that of providing for their safety seems to be the first. The *safety* of the people doubtless has relation to a great variety of circumstances and considerations, and consequently affords great latitude to those who wish to define it precisely and comprehensively."

Happily, I am not today required to make such decision.

Finally, I recall that it is recorded in history that in 1772 the Reverend Henry Knox taught Alexander Hamilton that rule without reason damages both the rulers and the ruled. Surely the experience of countless generations in this and other lands has demonstrated to the perceptive that this is true.

Being unable, in the circumstances of this case, to equate the action of the Bureau of Motor Vehicles in suspending the driver's license of appellant for six months with the administration of justice in due course of law as required by Article I, Section 16, Ohio Constitution, the same is disapproved as unlawful.

Counsel may prepare a suitable journal entry.