In re Appeal of Noneman.

(No. 20490—Decided April 23, 1973.)

Court of Common Pleas of Paulding County.

*Mr. Sumner J. Walters*, for appellant.
*Mr. William T. Hunt*, special prosecuting attorney, for respondent.

Hitchcock, J. This court in *In re Appeal of Williamson* (1969), 18 Ohio Misc. 67, 246 N. E. 2d 618, at page 72, said:

"Consequently, the court finds that it has jurisdiction to consider what it conceives to be the basic issue which is, 'Does that part of Article I, Section 16, Ohio Constitution, reading, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputa-

tion, shall have remedy by due course of law, and shall have justice administered without denial or delay. * * *" permit the Bureau of Motor Vehicles to suspend a driver's license for six months for refusing, while such driver's faculties are allegedly impaired, to submit to a chemical test for ascertaining the level of alcohol in body fluids, when, upon the first occasion thereafter when his faculties are not impaired and he has the benefit of sober reflection or the assistance of counsel, he pleads "guilty" to a properly laid charge of the offense for which he was arrested?' This court answers this question, 'No,' for reasons hereinafter set out."

The present case, in the view of this court, presents the identical issue and the question is, "Should the answer be the same in the light of subsequent developments in the law?" This court finds that the answer should still be "No." The issue is again presented to this court because the judge of the Paulding County Court has disqualified himself and this court has been designated to hear this appeal pursuant to R. C. 2937.20.

On May 28, 1970, in an unreported case, No. 19962, entitled *In the matter of Darrel D. Pease* this court made an order in a similar fact situation reversing a license suspension as contrary not only to Section 16, Article I of the Ohio Constitution, but also as a denial of liberty without due process under the Fourteenth Amendment to the United States Constitution. Neither cause was further appealed nor can the court find any decision of the Court of Appeals for the Third Appellate District wherein this precise issue has been forthrightly dealt with. So it adheres to the concept of law expressed in the syllabus of *Williamson* (18 Ohio Misc. 67), adding only to paragraph two thereof "and is contrary to the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States."

After the decision in *Williamson* was made, the prosecuting attorney who was such when the case was heard informed the court he thought the decision was correct and right. A successor was prosecuting attorney when the

judgment entry was filed. He told the court that he did not appeal the judgment because he could not see that it frustrated any salutary enforcement of the law. Moreover, not a single officer among the court's many police officer acquaintances ever so indicated.

Because the law firm of which the prosecuting attorney is a member is general counsel for a number of appellant's enterprises a special prosecutor was appointed to defend and argue this appeal.

As decisions and comment agreeing and disagreeing with *Williamson* have followed in its wake and have been noticed by this court it is deemed appropriate to review and discuss them.

In early 1970, *Williamson* was discussed in a comment by Terry A. Bethel, 31 Ohio St. L. J. 607, entitled MOTOR VEHICLES—Implied Consent Statute, which listed cases from western states which agreed with this court's preception of the purpose of R. C. 4511.191 but disagreed as to its perception of the effect a guilty plea should have in the circumstances (a judgment concurred in by the then Attorney General of Ohio)[1] and concluded, at page 609, that:

---

[1] At page 610 of 31 Ohio St. L. J., Bethel said, "The best that can be said of the *Williamson* decision is, perhaps, better left unsaid"— a statement which leads the court to reveal the fact that a number of Ohio lawyers have written the court approving the *Williamson* rationale and a greater number of lawyers, including several county and municipal judges, have spoken to like effect. An example of each is as follows:

This letter was received from a graduate of two of the country's oldest and most prestigious universities who is now a member of a leading Cleveland law firm:

"It is not often that one reads an opinion in the Ohio Bar as scholarly, well thought-out, judicious and literate as the one you wrote in the *Williamson* case, 18 Ohio Misc. 67. The type of reasoning and writing evidenced by that opinion is, in my opinion, worthy of some of the greatest justices of the Supreme Court. In view of the issues raised by the case, and the great deal of time and effort which you obviously spent in resolving them, I feel that both your reference to and quotation from Lord Nottingham are particularly appropriate.

"The legal profession is not held in the same esteem by the general public that it once was. By the same token, respect for the judi-

"Viewed in light of the construction and purpose of Section 4511.191, the position adopted by the Western states seems clearly superior to the present Ohio decisions. There is nothing in Section 4511.191 to indicate that the legislature intended a result such as *Williamson* and its Attorney General's encore. The statute expressly provides that the 'registrar * * * shall suspend' the license of *any* person who refuses the test, with no person or class excepted. It seems obvious that had the legislature intended to except individuals like Williamson it would have patterned a statute after Vermont's, or otherwise expressly provided for the exception. Judge Hitchcock's reading of the statute, then, given the absence of little, if any, legislative concurrence, must have sent legislators scurrying to the library to re-examine their work.

"If the legislators were surprised by the court's interpretation of Section 4511.191, they must have been bewildered by Judge Hitchcock's statement of the law's purpose. The court decided that the administrative suspension is designed to protect the public by denying driving privileges to someone who is probably dangerous. The court also contends that an administrative suspension after a guilty plea in criminal court would be unconstitutional. This is a curious kind of constitutional law at

ciary has, I believe, declined in recent years. While there are undoubtedly many reasons for this, I think that if more judges dealt with more cases the way you have treated the *Williamson* case, both from the point of view of the application of logic in conjunction with legal precedent and the manner of reducing the result to writing, we lawyers and judges would be suffering less of an image problem."

At a Northwestern Ohio Bar meeting in 1971, a young lawyer, admitted in 1965, said to me, "Judge, I think it regrettable that the Ohio Supreme Court did not buy your best decision." Not knowing to what he referred I discovered he was making reference to the *Williamson* case which he considered had been at least supplanted by *Hoban* v. *Rice*, 25 Ohio St. 2d 111, 267 N. E. 2d 311, decided February 24, 1971. I am unable to perceive that the Ohio Supreme Court has ever weighed the precise issue I perceived in *Williamson* in the light of Section 16, Article I of the Ohio Constitution or Section 1, Fourteenth Amendment to the United States Constitution, and dealt with same in a syllabus.

best. It is submitted that the administrative punishment of Section 4511.191 arises because of the defendant's refusal to cooperate, not because he is probably dangerous. His refusal, in effect, revokes the permission that he has already given by operating an automobile on the highway. The administrative suspension, then can be seen as either a deterrant to refusal or a punishment for refusal, or, perhaps both. The only constitutional problem presented is when the purpose of the statute is said to be punishment administratively for what cannot be done judicially. The defendant, if guilty of drunken driving, is to be assessed a penalty under Section 4511.191 of the Ohio Revised Code. To say that the implied consent law is to function in lieu of this penalty when adequate evidence for a conviction is unattainable seems so clearly violative of due process requirements that it is strange the court should even suggest it.''

In the view of this court the *Williamson* rationale as to what the state and national constitutions require in interpretation of R. C. 4511.191, an interpretation not required by the very terms of the Vermont statute (23 V. S. A. Section 1191), in absence of positive legislative direction, and the Ohio court decisions and Attorney General's opinion agreeing with *Williamson* are clearly superior to the position of both the western decisions and the Ohio decisions which seem to concur with them in terms of (1) something honest men can call justice; (2) the fact that there is nothing to indicate that the Ohio Legislature ever dealt with the precise issue because it maintains no record comparable to The Congressional Record; (3) considering the legislators of character and intelligence known to this court it seems much more likely that had they ever considered the problem they would have written the statute precisely as did the Vermont Legislature or they would have made a contrary positive pronouncement: (4) this latter seems very unlikely in view of the fact that our legislators do not commonly command official acts having all the moral quality of kicking a man when he is already down or imposing

what amounts to an actual mandatory double jeopardy; (5) the fact that the state promotes the sale of alcoholic beverages; (6) that the state should be aware that at least 5% of all adult citizens cannot manage alcohol with general basic sobriety.[2]

For me, the basic question seems to be, "What is the meaning of what it did enact?" in respect to an interpretation of the statute in light of constitutional rights. The statute does not describe the precise factual situation of these appeals.

This court did not in *Williamson* say that the legislature is powerless to require such license suspension if it deems it absolutely essential for the public safety; only that in the absence of explicit legislative direction indicating a clear judgment on the issue that this court would interpret the statute as per the early Ohio Supreme Court

[2]See 56 Judicature, June-July 1972, at page 24, reprinted in 77 Case & Com., November-December 1972, at page 3, for an excellent and understanding article entitled, The Alcoholic Driver, by Martin G. Blinder and Guy O. Kornblum. Their first paragraph reads:

"Five million Americans, five per cent of the adult population are alcoholics. The majority of them drive."

Their first footnote reads as follows:

"Authorities vary as to the definition of 'alcoholic' or 'alcoholism.' The Cooperative Commission on the Study of Alcoholism speaks of 'problem drinking,' which includes alcoholism. 'Problem drinking' is defined as a 'repetitive use of beverage alcohol causing physical, psychological and social harm to the drinker or others.' This definition stresses an interference with functioning rather than any specific drinking behavior. The amount or frequency of drinking is not a primary criterion. 'Alcoholism' is defined as a 'condition in which an individual has lost control over his alcohol intake in the sense that he is consistently unable to refrain from drinking before getting intoxicated.' Plaut, *Alcohol Problems—A Report to the Nation by the Cooperative Commission on the Study of Alcoholism* at 37-39 (1967) (hereinafter cited as *Alcohol Problems*).

"The Uniform Alcoholism and Intoxication Treatment Act adopted in 1971 defines alcoholism in these alternative ways: 'a person who habitually lacks self-control as to the use of alcoholic beverages, or uses alcoholic beverages to the extent that his health is substantially impaired or endangered or his social or economic function is substantially disrupted * * *.'"

precedents, a result which now coincides with the explicit direction found in the Vermont statute.[8]

In respect to Mr. Bethel's assertion that—

"It is submitted that the administrative punishment of Section 4511.191 arises because of the defendant's refusal to cooperate, not because he is probably dangerous."

My reply is simply that if not probably dangerous there is no need for the exercise of any police power.

My disagreeing confreres, it seems to me, fail to perceive the fundamental requirement of substantive constitutional due process with the flesh and blood impact of the entire situation in which the citizen finds himself. I for one cannot interpret a statute which does not positively command it, which requires me to take advantage of the condition of one who is mentally ill, a child, or under the influence of anything impairing normal faculties, and visit upon such citizen administrative consequences amounting to a factual double jeopardy and a penalty in fact (license suspension) in excess of that which a judge properly or-

---

[8]In 1969 O. A. G. No. 69-125, Attorney General Paul W. Brown synthesized his view in this syllabus:

"The Bureau of Motor Vehicles does not have the power to suspend the license of a driver who has refused to submit to a chemical test pursuant to the provisions of Section 4511.191, Revised Code, when such driver, within ten days, appears in the forum where charged and pleads guilty as his *first advised* plea to the offense for which he was arrested." (Emphasis supplied.)

Certainly there can be scarcely any doubt that in terms of longstanding rules of the Ohio Supreme Court that statutes should be interpreted so as to avoid "absurd results" even if deemed contrary to literal import; in terms of humane treatment; and in terms of practical wisdom in (1) promoting better and safer driving, (2) in obtaining advised and truthful guilty pleas, (3) in not fastening upon an unfortunate minority what amounts to double penalties while their obligation to support themselves, families, and government continues unabated, (4) in promoting respect for law generally; and in preventing countless employees and highway patrolmen from being employed countless hours at public expense in endeavors which can hardly promote salutary driving anymore than beating a dead dog can improve its health, the Attorney General's opinion is a wise and just one. Of course, it is noted that this same Attorney General Brown is again Mr. Justice Paul W. Brown of the Supreme Court of Ohio.

ders upon the record, by requiring of such person a decision he is unable to clearly appreciate in the absence of some truly dangerous threat to public safety.

A proper respect for due process under the Fourteenth Amendment it seems to me, will require that serious administrative consequences may not be had by reason of a decision required from one with impaired faculties without giving such person reasonable opportunity to make such decision when his faculties are unimpaired or a guardian or other suitable person may act for him.

Justices Powell and Rehnquist of the United States Supreme Court it seems to me, have in not too dissimilar circumstances indicated that they appreciate this distinction. See *Argersinger* v. *Hamlin* (June 12, 1972), 407 U. S. 25, 92 S. Ct. 2006, where Mr. Justice Powell, concurring in result, states, at page 48:

"Serious consequences also may result from convictions not punishable by imprisonment. Stigma may attach to a drunken-driving conviction or a hit-and-run escapade. Losing one's driver's license is more serious for some individuals than a brief stay in jail. In *Bell* v. *Burson,* 402 U. S. 535 (1971), we said:

" ' Once licenses are issued, as in petitioners case, their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.' *Id.,* at 539.

"When the deprivation of property rights and interests is of sufficient consequence, denying the assistance of counsel to indigents who are incapable of defending themselves is a denial of due process."

This court is unable to perceive that either *State* v. *Starnes* (1970), 21 Ohio St. 2d 38, 254 N. E. 2d 675, or *Hoban* v. *Rice, supra* (25 Ohio St. 2d 111), have explicitly dealt with the issue as viewed by this court in terms of due process under the Fourteenth Amendment to the United States Constitution, and determined same in a syllabus.

The suggestion that the *Williamson* rationale is contrary to *United States* v. *Jackson* (1968), 390 U. S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209, made by the Court of Appeals for Franklin County in *Hoban* v. *Rice* (1970), 22 Ohio App. 2d 130, 133, 259 N. E. 2d 136, 138, is not persuasive as the decision in *Jackson* had no connection with impaired faculties.

In my view the decisions or comment which have unfavorably criticized the rule of *Williamson* have missed the main thrust of that decision in respect to the very narrow point there decided.

For me, these decisions seem to assume that the significance of an ounce of ink splashed upon a coal pile is equal to an ounce splashed upon a Raphael or a Rembrandt hanging in the National Gallery of Art. Although I could concede equality in terms of liquid measure, I perceive other consequences are vastly different.

Despite our knowledge that alcoholics constitute at least a 5% minority with a congenital inability to use alcohol not common to the vast majority of citizens; that R. C. 4511.99 (C), requires a mandatory first offense penalty for DWI of not less than 3 days imprisonment and R. C. 4507.-16 requires a license suspension of at least 30 days; and that easily available 1970 Census data tells us that in our nation and state there are:

( 1)  111,543,000  licensed drivers of motor vehicles in the U. S.;

( 2)    6,105,000  licensed drivers of motor vehicles in Ohio;

( 3)   89,230,567  licensed passenger automobiles in the U. S.;

( 4)    5,305,381  licensed passenger automobiles in Ohio;

( 5)     *103,307  licensed stores dispensing alcoholic beverages in the U. S.;

( 6)       *5,464  licensed stores dispensing alcoholic beverages in Ohio;

( 7)     *127,110  bars and grills licensed to dispense alcoholic drinks in the U. S.;

( 8)       *8,210  bars and grills licensed to dispense alcoholic drinks in Ohio;

| | | |
|---|---|---|
| ( 9) | 4,244,862 | persons in the U. S. travel to work via bus and streetcar; |
| (10) | 209,117 | persons in Ohio travel to work via bus and streetcar; |
| (11) | 1,767,594 | persons in the U. S. travel to work via subways and elevated railroads; |
| (12) | 5,275 | persons in Ohio travel to work via subways and elevated railroads; |
| (13) | 501,556 | persons in U. S. travel to work via railways; |
| (14) | 1,446 | persons in Ohio travel to work via railways; |
| (15) | 50,697,919 | persons in the U. S. drive automobiles to work; |
| (16) | 2,857,138 | persons in Ohio drive automobiles to work; |
| (17) | 9,024,631 | persons in the U. S. ride to work in passenger automobiles; |
| (18) | 457,759 | persons in Ohio ride to work in passenger automobiles; |
| (19) | 5,689,819 | persons in the U. S. walk to work and; |
| (20) | 238,391 | persons in Ohio walk to work. |

*1967 data, latest available.

I perceive that those saying the *Williamson* rationale is wrong are in effect saying that bedeviling drunk drivers with license suspension, willy nilly, after making a *first advised* plea of guilty somehow has some definite salutary effect in promoting better driving and better citizenship. This court has to date seen no evidence that this procedure in the circumstances stated promotes better driving any more than a father's licking his youthful son on Saturday for what he did in his mother's presence on Monday promotes in such son either better behavior or a better attitude.[4]

---

[4]Perhaps recital of personal experience in not perfectly appropriate but I feel not irrelevant the one situation observed by me wherein thousands of young American males were strongly motivated to more careful driving. As it is all based upon imperfect memory it may be slightly inaccurate but I am sure the main point will be apparent. A few years after World War II I wrote a Pulitzer Prize news reporter

A century ago, Dostoyevski, with peculiar credentials of experience, examined with perspicacity the administration of criminal law in his land and indicated some con-

---

an account of this experience He replied in longhand on a sheet of tablet paper. "Interesting, but the American people just don't give a damn. They are just going to keep on driving and killing people." Not many weeks later he died, by reason of being struck by an automobile while walking in a city street.

General Joseph V. Stilwell in 1945 was Military Governor of Okinawa. In August, 12 G. I.'s from all the services were killed in motor vehicle accidents and 65 so badly wounded they required attention in a general hospital for repair. As ranking officer he persuaded the commanders of Navy, Marine and Air Forces to enter a compact agreeing he should prepare an Island Traffic Code which would be enforced by his base command MP's who would do nothing except stop observed violators, remove them from their vehicle, and inform them they could walk to wherever they were going whereupon they would be given a receipt showing that the commanding officer of the offending driver's unit could obtain the vehicle next day from the Provost Marshal at his headquarters upon show of papers it was a vehicle belonging to the unit. No arrests would be made or charges filed unless the driver demanded a trial by courts-martial. A former state highway patrolman, the traffic officer, proposed use of a slightly condensed version of the then Uniform Traffic Code. General Stilwell required it be summarized into 17 double space lines which, as I recall, began:

"TRAFFIC CODE, OKINAWA, 1945

"(1) Maximum speed, 35 miles per hour.

"(2) All drivers will have G I. driver's licenses.

"(3) All drivers will have trip tickets.

"(4) Drunks will not drive, etc."

The traffic officer told me that when he submitted this code the General said, "Good, they can read that—and what's more, I'll expect them to." About Monday, September 17, this code was placed on every unit bulletin board and on the following Saturday the enforcement forces were directed to proceed. That night 105 vehicles were seized from offending drivers and parked with the Provost Marshal. At breakfast the next morning I was told of drivers who had walked from 7 to 22 miles to find their bed. The next Saturday night the police force was doubled but could only find 5 violators. The driving in the interim was exceptionally commendable and uneventful. In October, General Stilwell was transferred to Washington, D. C., and I was hospitalized in November so cannot report subsequent development. Still, in my view, the drive correctly or "walk now" policy produced excellent results in a humane manner and without the expense, friction, and waste of time common to our general criminal administration of traffic law.

clusions that this court does not know to have been refuted, viz.:

"With ready made opinions one cannot judge of crime. Its philosophy is a little more complicated than people think. It is acknowledged that neither convict prisons, nor the hulks, nor any system of hard labour ever cured a criminal." The House of the Dead (prison life in Siberia) (1861-1862) Part I, Chapter 9.

"Humane treatment may raise up one in whom the divine image has long been obscured. It is with the unfortunate, above all, that humane conduct is necessary." *Ibid*, Part I, Chap. 9.

The suspension of appellant's license will be reversed as unlawful, being contrary to the requirements of Section 16, Article I of the Ohio Constitution and Section 1, Fourteenth Amendment to the United States Constitution.

Counsel may prepare an appropriate judgment entry.